### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

------------------------------
Domingo SANCHEZ,                 :
                                 :
          Plaintiff,             :        Civ. No. 05-3179(DRD)
     v.                          :
                                 :
                                 :
COMMISSIONER OF SOCIAL           :        **O P I N I O N**
SECURITY,                        :
                                 :
          Defendant.             :
------------------------------

Harry J. Katz, Esq.
12 Jenks Road
Morristown, New Jersey 07960
     Attorney for Plaintiff


Christopher J. Christie
United States Attorney
By:  Gina Shin
     Special Assistant U.S. Attorney
C/O Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004
     Attorney for Defendant


**DEBEVOISE, Senior District Judge**

     Plaintiff, Domingo Sanchez ("Plaintiff"), appeals from a
final determination of the Commissioner of Social Security
("Commissioner") denying his application for Supplemental
Security Income ("SSI") benefits under the Social Security Act
("the Act"). Plaintiff contends that the Administrative Law Judge
("ALJ") failed to meet her obligation to fully develop the

1

medical record. For the reasons set forth below, the Commissioner's determination is Affirmed.

## I. <u>FACTS AND PROCEDURAL HISTORY</u>

Plaintiff began feeling ill in 1999, when he was a sixty-nine year old machine operator, and later a porter, at a doll factory. (R. at 36). He was hospitalized at St. Mary's Hospital on February 2, 2000 for treatment of cardiomyopathy (<u>Id.</u> at 150), and was released on February 8, 2000. (<u>Id.</u> at 151). Plaintiff was again hospitalized at The General Hospital Center on April 27, 2000 to undergo cardiac catheterization, which revealed severe pulmonary hypertension and critical aortic stenosis with cardiomyopathy. (<u>Id.</u> at 172). He was released a day later (<u>Id.</u> at 171), and underwent aortic valve replacement on May 4, 2000 at St. Joseph's Hospital. (<u>Id.</u> at 201).

On February 16, 2001, Dr. Howard Baum of the New Jersey Department of Health and Human Services, Division of Disability Determination Services, performed a consultative examination as part of a periodic review of Plaintiff's disability status. (<u>Id.</u> at 201-03). During the physical examination, Plaintiff was able to ambulate without a walker and without significant difficulty. He experienced tenderness in the sternotomy suture area, which limited his ability to bend or twist, and occasional left-sided spasmodic neck pain. He also had venostasis changes in his lower

extremities. However, Plaintiff had full range of joint motion without deformity, and his electrocardiogram showed a normal sinus rhythm. (Id. at 201-03).

On March 14, 2001, Dr. W.K. Gallager, a nonexamining State agency medical physician, found that Plaintiff could perform light work.[1] (Id. at 212-19).

Plaintiff applied for SSI benefits on February 27, 2002, alleging disability since March 30, 2000 due to diabetes and a heart condition. (Id. at 50). His application was denied on December 26, 2002. (Id. at 66-71). Plaintiff filed for reconsideration on January 22, 2003 (Id. at 72), but the Social Security Administration ("SSA") denied his request on March 24, 2003. (Id. at 73-76). Plaintiff requested a hearing before an ALJ on June 20, 2003. (Id. at 77-78). The hearing was conducted on April 21, 2004. (Id. at 30-38). Plaintiff was advised of his right to representation before an administrative hearing, but chose to proceed without counsel. (Id. at 30-32). His grandson, Mr. Edward Sanchez, testified at the hearing. (Id. at 40-43). Dr. Donald Peyser also testified as a medical expert. (Id. at 43-46). A Spanish interpreter was present at the hearing. (Id. at 30).

---

[1] Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. To be considered capable of performing a full range of light work, an individual must be able to walk, stand, or push and pull with arms and legs while sitting. A person who can do light work can also perform sedentary work, unless there are additional limiting factors, such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 416.967(b).

On April 29, 2004, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work and therefore was not disabled within the meaning of the Act. (Id. at 26). Plaintiff filed an appeal to the Appeals Council on June 28, 2004. (Id. at 10). The Appeals Council affirmed the ALJ's decision on April 20, 2005 and denied further review. (Id. at 4-6). Having exhausted his administrative remedies, Plaintiff filed an action in this court on June 21, 2005, seeking judicial review of the ALJ's decision.

## II. EVIDENCE BEFORE THE ALJ

Evidence before the ALJ consisted of the testimony of Plaintiff, Plaintiff's grandson Mr. Edward Sanchez, and medical expert Dr. Donald Peyser; and medical records.

A. Plaintiff's Testimony

At a hearing held on April 21, 2004, in Newark, New Jersey, Plaintiff testified before ALJ Michal Lissek. (Id. at 30). Plaintiff testified that at the time of the hearing, he was a seventy-four year old male who had a second grade education from the Dominican Republic. (Id. at 35-36). He came to the United States in 1994 and does not speak English. (Id. at 36). Plaintiff did agricultural work in Santo Domingo. (Id.). He worked in the United States from 1995 to 2000 in a doll factory. (Id. at 36-37). At the factory, Plaintiff worked as a machine operator

4

for approximately two and a half years, and then as a porter. (Id. at 37).

Plaintiff testified that his machine operator position was a sitting job that consisted of attaching dolls' feet to their bodies while a machine moved the dolls down a line. (Id.). Plaintiff assembled dolls of various sizes, but none of them were heavy. (Id. at 38). He was not required to do any heavy lifting (Id.), and stated that his job was not physically demanding. (Id. at 39). However, Plaintiff did heavy lifting as a porter. (Id. at 38).

When asked if he could work as a machine operator now, Plaintiff said that he could not because the factory has closed. (Id. at 39). He also noted his inability to work at the factory if it were open, because he experiences shortness of breath as a result of his surgery. (Id.). Plaintiff further stated that his chest hurts whenever he exerts any type of strength. (Id.).

Plaintiff testified that on a typical day, he does virtually nothing. (Id.). Ever since his surgery, he experiences chest pain about twice a day, when he does any extraneous movement. (Id. at 40). Plaintiff stated that this pain feels similar to a nail pinching his chest, but is not caused by anything he does. (Id.). He does not feel much pain when resting in bed, but it travels to other areas of his body. (Id.). Plaintiff stated that he does not experience significant chest pain when he walks, but gets dizzy

5

when he climbs stairs. (Id.). He does not claim to have pain anywhere other than at the surgery site. (Id.).

B. Mr. Edward Sanchez's Testimony

Mr. Sanchez, Plaintiff's grandson, testified that he does not live with Plaintiff, but sees him almost daily. (Id. at 41). He calls to make sure Plaintiff is okay, visits Plaintiff about three times a week, and spends two to three hours with Plaintiff during the weekends. (Id.).

According to Mr. Sanchez, Plaintiff is unable to work because he cannot lift anything heavy or bend down well as a result of his surgery. (Id. at 42). Mr. Sanchez stated that Plaintiff was able to work before he underwent surgery, but now cannot work because it is uncomfortable and very difficult. (Id.). Mr. Sanchez claimed that Plaintiff could do a non-physically demanding job that involved sitting for only a few days, because he gets tired even when he walks. (Id.). According to Mr. Sanchez, Plaintiff can walk approximately ten blocks before he gets tired. (Id.).

Mr. Sanchez testified that on a typical day, Plaintiff either stays home or goes to the doctor. (Id.). To travel to his medical appointments, Plaintiff either takes a taxi or gets a ride from his grandson, if the latter is absent from work. (Id.). Plaintiff can also take the bus by himself. (Id. at 43). Mr. Sanchez stated that he drove Plaintiff to the hearing. (Id.).

6

According to him, Plaintiff cannot work because he gets tired and needs to stop whenever they take a walk. (Id.).

    C. <u>Dr. Donald Peyser's Testimony</u>

    Dr. Peyser testified that Plaintiff's primary disease was aortic stenosis, which became critical in May 2000. (Id. at 44). The aortic valve was replaced at that time. (Id.). Plaintiff also has mild diabetes, which he treats with medication. (Id. at 45). His blood sugar levels run between 100 and 170. (Id.). Dr. Peyser stated that the original catheterization revealed that Plaintiff's coronary vessels were completely normal as of May 2000, and that Plaintiff has no arterial sporadic heart disease. (Id.). An August 2000 stress echo produced normal results, and there was no evidence of induced ischemia or lower-motion abnormalities. (Id.). Dr. Peyser opined that Plaintiff's pulmonary function studies were good. (Id.). He also stated that any evidence of congestive heart failure has completely resolved following Plaintiff's aortic valve replacement. (Id.).

    Dr. Peyser testified that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the criteria of any impairments listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (Id.). According to Dr. Peyser, Plaintiff's current pain is due to a chest wall problem that results from his surgery incision, rather than his heart. (Id. at 45-46). He claims that Plaintiff is able to do light and/or

sedentary work, given his non-cardiac pain and proper heart function. (Id. at 46-47). However, Plaintiff claims that he cannot work. (Id. at 46).

D. Medical Records

The following medical records reflect doctors' treatment and examination of Plaintiff between February 2, 2000 and June 20, 2003:

(i.) Dr. Emmanuel Reyes

Plaintiff was admitted to St. Mary's Hospital on February 2, 2000 for cardiomyopathy and non-insulin-dependent diabetes. (Id. at 150). Attending physician Dr. Reyes performed a chest x-ray, which showed an enlarged heart and status post congestive heart failure. (Id. at 154). An echocardiogram revealed concentric left ventricular hypertrophy, poor left ventricular function, pericardial effusion, mild right ventricular enlargement, and left atrial enlargement. (Id. at 167). Echo Doppler showed a moderate mitral and tricuspid regurgitation, mild aortic regurgitation, and moderate aortic stenosis. (Id.). A MUGA scan revealed a left ventricular ejection fraction of 28%. (Id. at 152).

During his hospital course, Plaintiff's lower extremity edema disappeared, as did the rales in both lung bases. (Id.). Plaintiff was able to walk freely without chest pain, shortness of breach, or palpitations. (Id.). He was discharged on February

8

8, 2000 and continued on Lasix, Cardizem, Zestril, and Gulcotrol. (Id. at 152-53).

In a March 9, 2000 report, Dr. Reyes stated that Plaintiff went to the clinic for follow-up appointments every two weeks and was last seen on March 3, 2000. During that time, he still had uncontrolled diabetes and complaints of malaise/fatigue. (Id. at 251). Dr. Reyes advised Plaintiff to rest and to gradually increase his physical activity in the ensuing weeks. (Id.). Dr. Reyes also stated that Plaintiff might be able to return to work on April 3, 2000. (Id.).

Progress notes from February 17 to March 31, 2000 revealed that Plaintiff did not complain of chest pain or shortness of breath, and only reported occasional dyspnea on walking. (Id. at 243-45).

A persantine thallium stress scan conducted on April 5, 2000 showed left ventricular dilatation and partially reversible ischemia in the apex, anterior wall, and inferior wall (Id. at 280).

Plaintiff was admitted to The General Hospital Center on April 27, 2000 to undergo cardiac catheterization, which revealed severe pulmonary hypertension and critical aortic stenosis with cardiomyopathy. (Id. at 179). However, there was no significant coronary artery disease. (Id.). Echo Doppler indicated critical aortic stenosis, mild mitral regurgitation, moderate tricuspid

9

regurgitation, but no significant aortic regurgitation. (Id. at 197).

After the catheterization, Plaintiff remained asymptomatic without chest pains or shortness of breath, and was able to walk around. (Id. at 172). He was released a day later (Id. at 171), and continued on Lasix, Cartia, Zestril, and Glucotrol. (Id. at 173).

Dr. Reyes advised Plaintiff to have aortic valve replacement, which he underwent on May 4, 2000 at St. Joseph's Hospital. (Id. at 201).

Progress notes from May 15 to September 19, 2000 showed that Plaintiff had no complaints of chest pain or shortness of breath, and that his diabetes was controlled. (Id. at 235, 238-42).

On June 6, 2000, x-rays of Plaintiff's pelvis and right and left hips revealed minimal degenerative changes. (Id. at 272).

Progress notes from December 14, 2000 indicated that Plaintiff had no chest pain or shortness of breath, but reported occasional dyspnea on walking. (Id. at 234). Dr. Reyes also issued a report on the same day, stating that Plaintiff remained disabled. (Id. at 248).

On August 21, 2001, Plaintiff reported that his dyspnea on exertion when walking was not getting worse or more frequent. (Id. at 232). Plaintiff's blood pressure was 112/70 and he was advised to diet, exercise, and lose weight. (Id.). On December

10

13, 2001 and March 26, 2002, Plaintiff denied chest pain or shortness of breath. (<u>Id.</u> at 230-31).

In a March 4, 2003 report, Dr. Reyes noted that Plaintiff did not appear for follow-up appointments beginning March 26, 2002, although he had previously attended these appointments every two to three months. (<u>Id.</u> at 225). As of March 26, 2002, Plaintiff had no complaints of, and clinical evidence did not show, chest pain, shortness of breath, headaches, dizziness, dyspnea on exertion, or palpitations. (<u>Id.</u>). Dr. Reyes stated that he was unable to provide a medical opinion regarding Plaintiff's ability to perform work-related activities. (<u>Id.</u> at 227).

A March 28, 2002 electrocardiogram revealed a normal sinus rhythm and nonspecific ST-T changes. (<u>Id.</u> at 257).

(ii.) <u>Dr. Stanley A. Szwed</u>

On August 7, 2000, a stress test conducted by cardiologist Dr. Szwed revealed that Plaintiff had no chest pain, dyspnea, or leg fatigue. (<u>Id.</u> at 267). Blood pressure and heart rate responses were appropriate. (<u>Id.</u> at 268). Testing was positive for stress induced arrhythmia, but negative for stress induced ischemia. (<u>Id.</u>). A resting electrocardiogram revealed left ventricular hypertrophy with a normal sinus rhythm. (<u>Id.</u> at 267).

Dr. Szwed referred Plaintiff to be examined on July 16, 2001 for complaints of shortness of breath on exertion. (<u>Id.</u> at 261).

11

The results indicated that Plaintiff's lungs were clear, that his heart had a regular sinus rhythm, and that he had no pedal edema. (Id.). Plaintiff had mild cardiomegaly, arrhythmia, status-post aortic valve replacement, diabetes, and arthritis of the lumbosacral spine and left sciatica. (Id.).

    (iii.) Dr. Howard Baum

    Consultative physician Dr. Baum performed an examination on February 16, 2001, as part of a periodic review of Plaintiff's disability status. (Id. at 201-03). Plaintiff's primary complaint was pain in the sternal operative site, which limited his ability to bend or twist. (Id. at 201). He was able to walk two to three blocks without difficulty. (Id.). He had occasional left-sided spasmodic neck pain, but denied exertional chest pain. (Id.). He used a walker at home due to some instability, but had no significant arthritis. (Id. at 202).

    On examination, Plaintiff ambulated without a walker and without significant difficulty. (Id.). His blood pressure was 120/80. (Id.). Tenderness was present at his sternotomy site. (Id.). Plaintiff had full range of joint motion and no deformity. (Id.). His dorsalis pedis pulse was absent in both lower extremities. (Id.). The electrocardiogram showed a normal sinus rhythm, and a chest x-ray showed a cardiothoracic ratio of 15/33. (Id. at 202-03). There was no congestive heart failure or infiltrates. (Id. at 203).

Dr. Baum stated that Plaintiff had a cardiomyopathy and was status-post aortic valve replacement. (Id.). Venostasis changes were present in the lower extremities. (Id.).

(iv.) Dr. W.K. Gallager, Jr.

In a March 14, 2001 report, Dr. Gallager, a nonexamining State agency physician, found that Plaintiff could perform activities consistent with the full range of light work. (Id. at 212-19).  He noted that Plaintiff's diabetes was not severe and that Plaintiff was doing well following his aortic valve replacement. (Id. at 223).

(v.) Dr. Juan Espindola

On July 27, 2002, Plaintiff reported dyspnea on exertion with an exercise tolerance of less than four blocks. (Id. at 296). A July 29, 2002 stress test indicated abnormal changes possibly due to myocardial ischemia and poor exercise tolerance. (Id. at 297). However, Plaintiff achieved 10.2 METS. (Id. at 298).

Progress notes from October 1, 2002 revealed periodic dyspnea on exertion, but no chest pain. (Id. at 295). Plaintiff reported no complaints on November 5, 2002; his blood pressure was 120/80 and his fasting blood sugar was 171. (Id. at 294).

In a March 10, 2003 report, Dr. Espindola stated that Plaintiff was seen on a monthly basis from October 14, 2002 to February 20, 2003. (Id. at 289). Plaintiff complained of pain at

13

the thoracotomy site and of dyspnea on exertion. (<u>Id.</u>). Plaintiff was referred to a cardiologist. (<u>Id.</u> at 291). Dr. Espindola noted that Plaintiff's fatigue was probably related to his history of aortic valve replacement. (<u>Id.</u>). However, he gave no specific information regarding any physical or other objective signs of chronic fatigue. Plaintiff had neither loss of motion nor neurological deficits. (<u>Id.</u>). Plaintiff also had no limitations with regard to lifting and carrying, and could stand and/or walk less than two hours a day, and could sit up to eight hours a day. (<u>Id.</u>).

(vi.) <u>Dr. J. Drice</u>

Dr. Drice, a nonexamining State agency physician, stated in a December 11, 2002 report that Plaintiff could perform medium work. (<u>Id.</u> at 287). Plaintiff's blood pressure was controlled, his diabetes was fairly controlled, and he achieved 10.2 METS on an exercise stress test, which according to Dr. Drice, corresponded to a RFC for medium work. (<u>Id.</u>).

## III. **<u>ADMINISTRATIVE DECISION/FINDINGS</u>**

After reviewing the above-referenced evidence, the ALJ made the following findings in her written decision:

1. Plaintiff has not engaged in substantial gainful activity since February 1, 2000, the alleged onset date of disability.

2. Plaintiff's history of cardiomyopathy, status-post aortic

valve replacement, and diabetes are considered "severe" based on the requirements in the Regulations 20 C.F.R. § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1 of 20 C.F.R. Part 404, Subpart P.

4. The undersigned finds Plaintiff's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5. Plaintiff retains the RFC to perform light work as defined in 20 C.F.R. § 416.967.

6. Plaintiff's past relevant work as machine operator did not require the performance of work-related activities precluded by his RFC. 20 C.F.R. § 416.965.

7. Plaintiff's medically determinable history of cardiomyopathy, status-post aortic valve replacement, and diabetes do not prevent Plaintiff from performing his past relevant work.

8. Plaintiff was not under a "disability" as defined in the Act, at any time through the date of the decision. 20 C.F.R. § 416.920(e). (R. at 26-27).

IV. **DISCUSSION**

Plaintiff contends that the ALJ's determination is not supported by substantial evidence, since the ALJ: (1) did not develop the medical record to make an informed decision; and (2) was under a heightened duty to do so. (Pl. Br. 11). In support of these arguments, Plaintiff claims that the ALJ had relied upon medical records that were fourteen months old at the time of Plaintiff's hearing on April 21, 2004. (Id.). He also notes that the ALJ did not ask Plaintiff whether he was in medical care at the time of the hearing. (Id.). Plaintiff further contends that the ALJ had a heightened duty to develop the medical record because Plaintiff was unrepresented by counsel. (Id. at 12).

A. Standard of Review

The district court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 1383(c)(3), which incorporates 42 U.S.C. § 405(g). The standard of review is deferential and is limited solely to ascertaining whether substantial evidence in the record supports the Commissioner's determination. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence" is "more than a mere scintilla. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The district court is bound by the Commissioner's factual findings if they are supported by

16

substantial evidence, even if the district court would have decided the factual inquiry differently. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Thus, the primary issue before the Court is whether substantial evidence supports the Commissioner's finding that Plaintiff was not disabled within the meaning of the Act.

     B. Determination of Disability

     Under the Act, SSI benefits are provided for individuals unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); Heckler v. Campbell, 461 U.S. 458, 459-60 (1983). A person is considered disabled only if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); Campbell, 461 U.S. at 460. The ALJ makes this disability determination by applying a five-step sequential evaluation promulgated by the SSA. See 20 C.F.R. § 416.920. A finding at any step that the claimant is not disabled is conclusive and ends the inquiry. 20 C.F.R. § 416.920(a)(4).

     At step one, the ALJ determines whether the claimant is

17

currently engaging in substantial gainful activity. 20 C.F.R. §
416.920. "Substantial gainful activity" is work activity that
involves doing significant physical or mental activities for pay
or profit. 20 C.F.R. § 416.972. If a claimant is found to be
engaged in substantial gainful activity, the disability claim
will be denied. (Id.). If the claimant is not, the ALJ proceeds
to step two.

At step two, the ALJ considers the medical severity of the
claimant's impairment(s). 20 C.F.R. § 416.920(a)(4)(ii). If the
claimant does not have any severe medically determinable physical
or mental impairment(s) that lasts for a continuous period of at
least twelve months, 20 C.F.R. § 416.909, he or she is not
disabled. 20 C.F.R. § 416.920(a)(4)(ii). The ALJ will not
evaluate claimant's vocational capabilities, such as age,
education, and work experience. 20 C.F.R. 416.920(c).

At step three, the ALJ compares the medical evidence of the
claimant's impairment to a list of impairments in Appendix 1 of
20 C.F.R. Part 404, Subpart P. The listed impairments are
presumed severe enough to preclude substantial gainful activity.
20 C.F.R. § 414.920(a)(4)(iii). If a claimant does not suffer
from a listed impairment or its equivalent, the analysis proceeds
to the fourth step.

At step four, the ALJ considers whether the claimant retains

the RFC,[2] in view of his or her age, education, and work experience, to perform past relevant work. 20 C.F.R. 414.920(a)(4)(iv). Both RFC and past relevant work may be classified as "sedentary," "light," "medium," "heavy," or "very heavy." See Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir. 1994); 20 C.F.R. § 416.967. If the claimant is able to perform previous work, he or she is not disabled. 20 C.F.R. 414.920(a)(4)(iv). If the claimant cannot resume his or her former occupation, the analysis moves to step five.

At step five, the burden shifts from the claimant to the ALJ, who must show that the claimant is able to perform other work in the national economy—in light of his or her RFC, age, education, and work experience—to deny a disability claim. 20 C.F.R. 416.920(4)(v). The claimant is entitled to SSI benefits only if he or she is not able to perform other work. (Id.). If the claimant can make an adjustment to other work, he or she is not disabled. The ALJ will often seek the assistance of a vocational expert at this stage. See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

---

[2] "'RFC' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000) (quoting Hartranft,181 F.3d at 359 n.1); see also 20 CFR. § 416.945.

C. <u>The ALJ's Development of the Medical Record</u>

Plaintiff contends that the ALJ erred in failing to develop the medical record, as she had relied upon medical reports that were fourteen months old at the time of Plaintiff's hearing. (Pl. Br. 11). He notes that the most recent medical records were from Dr. Espindola and dated February 20, 2003, whereas the hearing occurred on April 21, 2004. (<u>Id.</u>). According to Plaintiff, the ALJ did not inquire whether he was under medical care subsequent to February 20, 2003. (<u>Id.</u> at 8).

Plaintiff submitted medical records to the Appeals Council on June 18, 2004 to confirm his medical care during the period in question. (R. at 318). These medical records indicate that eight physicians prescribed twenty-two different medications for Plaintiff after February 20, 2003 and before the hearing date. (Pl. Br. 9; R. at 299-317). The medications included: Lipitor for high blood pressure; Isosorbide for cardiac illness; Digoxin for high blood pressure; Celebrex for pain; Albuterol for reactive airway illness; Methylprednisolone for pain; Glucovance for diabetes; Hyzaar for high blood pressure; Singulair for reactive airway illness; Foradil for reactive airway illness; Coreg for high blood pressure; Digitek, a tannic acid; Hydrocodone for pain; Keterolac for eye ailments; Flomax for prostate; Enulose for constipation; Promethazine for upper respiratory infections; Bextra for pain; Nasonex for allergies; Clarinex for upper

respiratory infections; Miacalcin for osteoporosis; Acetaminophen for upper respiratory infections; and Trituss for upper respiratory infections. (Pl. Br. 8; R. at 299-317).

The Commissioner argues that the ALJ properly developed the medical record in determining that Plaintiff was not disabled. (Def. Br. 5). According to her, the ALJ properly applied the five-step sequential evaluation to determine that Plaintiff could perform his past relevant work as a machine operator. (Id. at 5-6). The Commissioner points out that the ALJ had briefly adjourned the hearing to allow Plaintiff and his grandson to review the claim file. (Id. at 8). Plaintiff allegedly had no questions about his file and affirmed that "everything was okay." (Id.).

The Commissioner claims that Plaintiff identified only Dr. Reyes and St. Mary's Hospital as treating sources for his heart condition and diabetes during the relevant period of review, and that the ALJ had fully considered these sources when evaluating Plaintiff's SSI claim. (Id.). In addition, she claims that the ALJ fully evaluated the medical record in determining that Plaintiff was not disabled by his impairments. (Id.). The ALJ also relied upon Dr. Peyser's testimony and the findings of Drs. Reyes, Baum, Gallager, and Drice to support her decision that Plaintiff was not disabled. (Id. at 8-10).

The Commissioner contends that the "benign results from diagnostic tests such as electrocardiograms, stress tests, pulmonary function tests, and chest x-rays are consistent with the reports of treating, consultative and State agency physicians, and further support the ALJ's determination." (Id. at 10). The Commissioner also notes that Plaintiff did not submit the prescription medication printout to the Appeals Council until after the ALJ had issued her decision. (Id. at 11). Plaintiff did not establish that this printout was relevant and probative so as to alter the outcome of the ALJ's determination. (Id.). The Commissioner further argues that Plaintiff failed to show good cause for why such evidence was not presented to the ALJ in prior proceedings. (Id. at 12).

Plaintiff contends that the ALJ was under a heightened duty to develop the medical record because Plaintiff was not represented by counsel. (Pl. Br. 12). He claims that the ALJ should have inquired about his source(s) of medical care and obtained records before giving Plaintiff a hearing. (Id.). Instead, the ALJ closed the record and issued her decision eight days later. (Id. at 13). Plaintiff additionally notes that the ALJ did not offer Plaintiff a verbatim interpretation of Dr. Peyser's testimony; instead, the interpreter summed up the testimony. (Id. at 8).

22

The Commissioner concedes that the Agency must exercise heightened care in developing the record and explicitly weighing the evidence, especially where a claimant proceeds pro se. (Def. Br. 7). However, she argues that the ALJ fully satisfied her obligation to ensure the protection of Plaintiff's rights. (Id.). The Commissioner cites Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979), for the proposition that where a claimant has been informed of the right to counsel before an administrative hearing and knowingly waives it, his or her lack of representation is not itself cause for remand. According to her, the record indicates that the ALJ had informed Plaintiff in written English and Spanish of his right to legal representation prior to the hearing. (Def. Br. 7). The ALJ also informed Plaintiff of his right to counsel at the outset of the hearing, and offered to adjourn the hearing for thirty days to allow him to obtain counsel if he wished. (Id.). The Commissioner states that Plaintiff was given a brief recess to discuss the matter with his grandson before he ultimately chose to proceed without counsel. (Id.).

The ALJ properly applied the five-step sequential evaluation to determine that Plaintiff was not disabled within the meaning of the Act. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity after he filed his SSI application. (R. at 22). Indeed, Plaintiff had stopped working at

23

the doll factory since February 1, 2000, his alleged onset date. At step two, the ALJ determined that Plaintiffs' cardiomyopathy, status-post aortic valve replacement, and diabetes were severe impairments within the meaning of the Regulations. (Id.).

Although Plaintiff was not precluded from receiving SSI benefits at steps one or two, at step three, the ALJ found that Plaintiff's impairments were not "severe" enough to meet or medically equal any impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (Id.). She states that per Dr. Peyser's testimony, Plaintiff's congestive heart failure resolved completely following aortic valve replacement in May 2000. (Id.). Dr. Peyser additionally opined that Plaintiff's chest pain was musculoskeletal in nature, that an August 2000 stress echo was normal, and that pulmonary function studies were good. (Id.). The ALJ also notes that Plaintiff had achieved 10.2 METS, a figure "well above the 5 METS or less level required by Listing 4.02 and 4.04." (Id.). She further states that Dr. Reyes' reports indicate that Plaintiff did not complain of chest pain or shortness of breath, and only reported occasional dyspnea on walking. (Id.). Finally, the ALJ notes that although Plaintiff has diabetes, his blood sugars ranged from 100 to 170. (Id.). Given these findings, the ALJ correctly concluded that Plaintiff did not meet or equal any of the impairments listed in Appendix 1.

At step four, the ALJ determined that Plaintiff retained the

RFC to return to his past relevant work as a machine operator. In determining a claimant's RFC, the ALJ must evaluate all relevant evidence, including medical records, observations made during formal medical examinations, and the claimant's description of his or her limitations. <u>Burnett</u>, 220 F.3d at 121. Moreover, the ALJ's finding of RFC must "be accompanied by a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). In the present case, the ALJ discussed in the relevant medical evidence in great detail. She assessed Plaintiff's hospitalization at St. Mary's due to cardiomyopathy and diabetes, and the results from his chest x-ray, echocardiogram, Echo Doppler scan, and MUGA scan. (R. at 23). The ALJ noted Plaintiff's ability to walk freely without chest pain, shortness of breath, or palpitations, and the medications he took upon his discharge from the hospital. (<u>Id.</u>)

The ALJ also evaluated the opinions of treating physician Dr. Reyes. Under 20 C.F.R. § 416.927(d)(2), the opinions of treating physicians may be given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are consistent with other substantial evidence in the case. Dr. Reyes' progress notes indicated no recurrent arrhythmias, evidence of stroke, dyspnea on exertion, palpitations, headaches, or dizziness. (R. at 230-47, 261). Progress notes also showed that medication successfully

25

controlled Plaintiff's diabetes. (Id. at 230-47, 261-62, 265, 274, 278). In addition, Dr. Reyes stated in a March 4, 2003 report that Plaintiff did not appear for follow-up appointments beginning March 26, 2002, although he had previously attended such appointments every two to three months. (Id. at 225). Finally, Dr. Reyes opined that Plaintiff might be able to return to work on April 3, 2000. (Id. at 251). Although Dr. Reyes claimed that Plaintiff remains disabled in a December 14, 2000 report (Id. at 248), objective testing such as chest x-rays, a PFT, and stress test confirm that Plaintiff's heart condition resolved completely following the aortic valve replacement. Further, Dr. Reyes did not specifically provide evidence supporting Plaintiff's allegations of fatigue and dyspnea on exertion. As such, these findings collectively indicate that Plaintiff retained the RFC to perform past relevant work.

The ALJ also considered the medical findings and examinations of Dr. Drice and Dr. Gallager at step four of the sequential evaluation. Dr. Gallager stated in a March 14, 2001 report that Plaintiff had the RFC to perform light work. (Id. at 212-19). He noted that Plaintiff's diabetes was not severe and that Plaintiff was doing well following his aortic valve replacement. (Id. at 223). In addition, Dr. Drice determined on December 11, 2002 that Plaintiff had the RFC to perform activities consistent with the full range of medium work. (Id. at

26

281-88). Under 20 C.F.R. § 416.927(f), State agency physicians, such as Dr. Gallager and Dr. Drice, are "highly qualified physicians . . . who are also experts in Social Security disability evaluation." The reports of Dr. Gallager and Dr. Drice therefore constitute substantial evidence in support of the ALJ's determination that Plaintiff was capable of performing light and/or sedentary work.

20 C.F.R. § 416.965(a) defines "past relevant work" as work that a claimant has performed within the last fifteen years, that lasted long enough for the claimant to learn to do the job, and that constitutes substantial gainful activity. In the instant case, Plaintiff's employment as a doll-factory machine operator from 1995 to 2000 constitutes his past relevant work. According to Plaintiff, his position was a sitting job that neither required heavy lifting nor was physically demanding. (Id. at 38-39). This description squarely fits the 20 C.F.R. § 416.967(b) definition of "light work." Since the ALJ determined that Plaintiff had sufficient RFC for light work, she properly concluded that Plaintiff could return to his previous employment as he performed it. Plaintiff was therefore not entitled to SSI benefits. Plaintiff does not challenge the ALJ's findings or claim that they were not supported by substantial evidence. The sole issue for the complaint is that the ALJ did not further develop the medical record.

Although Plaintiff submitted a prescription medication printout to the Appeals Council designed to show that Plaintiff had received continuous medical care from February 20, 2003 through April 29, 2004 (Pl. Br. 11; R. 299-318), the Third Circuit has held that "evidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence." Matthews v. Apfel, 239 F.3d 589, 594 (3d Cir. 2001) (citing Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991)). Moreover, remanding a disability case for the taking of additional evidence requires that the evidence be material, relevant, and probative, and there must be a reasonable possibility that the new evidence would have changed the Commissioner's determination. Szubak v. Secretary of Health and Human Services, 745 F.2d 931 (3d Cir. 1984). The claimant must also show good cause for not having incorporated the new evidence into the administrative record. (Id.) In the present case, Plaintiff's printout of medications he took after February 20, 2003 is neither material nor particularly probative. As of March 26, 2002, clinical evidence showed that Plaintiff had no complaints of chest pain, shortness of breath, headaches, dizziness, dyspnea on exertion, or palpitations. (R. at 225). Further, Dr. Reyes stated in a March 4, 2003 report that Plaintiff did not appear for follow-up appointments beginning March 26, 2002, although he had previously attended such

appointments every two to three months. (Id.). A printout of Plaintiff's medications, many of which are documented throughout his medical record, would not likely alter the Commissioner's decision. Further, even assuming that the medication printout constituted new and material evidence, Plaintiff failed to show good cause for not having incorporated such evidence into the record.

Finally, the Court finds no merit in Plaintiff's contention that the case should be remanded for further review because he was unrepresented by counsel at the hearing. While this court has suggested that the ALJ should "assume a more active role" in developing the record "when the claimant is unrepresented" by counsel, Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979), a lack of counsel is not a sufficient cause for remand absent a showing of clear prejudice or unfairness at agency level proceedings. Domozik v. Cohen, 413 F.2d 5, 9 (3d Cir. 1969). In the present case, the ALJ took sufficient measures to ensure that Plaintiff's rights were protected. She informed Plaintiff of his right to legal representation, both in writing and at the hearing. (R. at 30-32; 82-90). She granted a brief recess to allow Plaintiff to discuss with his grandson the possibility of obtaining counsel, and offered to adjourn the hearing for thirty days to allow Plaintiff to seek counsel if he wished. (Id. at 32). Plaintiff himself chose to proceed without representation.

29

(Id. at 32-33). The list of medications that Plaintiff proffered after the hearing before the ALJ does not suggest that further exploration of medical treatment would change the results.

Given the ALJ's application of the five-step sequential evaluation, her sufficient development of the medical record, and medical findings that contain no evidentiary gaps, the ALJ's finding that Plaintiff was not entitled to SSI benefits because he was not disabled within the meaning of the Act is supported by substantial evidence and does not require remand for failure to develop the medical record.

----

**CONCLUSION**

For the foregoing reasons, the final determination of the Commissioner is affirmed. An appropriate order will be entered.

**  /s/ Dickinson R. Debevoise  **
Dickinson R. Debevoise, U.S.S.D.J.

Dated: July 9, 2007

30